**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 390 CEJ(SPM) |
| | ) | |
| MICHAEL CHANEY (3), | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. 92) and Motion to Suppress Statements (Doc. 93) be **GRANTED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of June, 2016.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 390 CEJ(SPM) |
| | ) | |
| MICHAEL CHANEY (3), | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b).

### BACKGROUND AND PROCEDURAL HISTORY

Defendant Michael Chaney is charged in an indictment with four counts of aggravated identity theft and one count of possession of 15 or more counterfeit access devices. The charges arise from a traffic stop and search of Chaney's vehicle by the Missouri State Highway Patrol near Macon County on the evening of June 30, 2015. At the time of the traffic stop, co-defendant Laporche Clark was driving Chaney's car. Co-defendants Tyris Barnes and Darneisha Perry were also in the car with Chaney and Clark. Chaney has filed motions to suppress physical evidence (Doc. 92) and statements (Doc. 93). There is no dispute that Missouri State Highway Patrol Trooper James Johnson had reasonable suspicion to stop Chaney's vehicle for speeding. The central issue in both motions is whether Trooper Johnson had reasonable suspicion to extend the traffic stop beyond the time necessary to issue the citation and otherwise complete the purpose of the stop.

On February 22, 2016, the undersigned held an evidentiary hearing on Chaney's motions. Missouri State Highway Patrol Trooper James Johnson appeared and testified on behalf of the United

States. The United States also submitted a video recording of the events surrounding the traffic stop taken from the dashboard camera of Trooper Johnson's patrol car (Govt. Exh. 1) (the "dashcam video"). Also admitted into evidence were a CAD incident report (Govt. Exh. 2); the Missouri Police K-9 Association Award of certificate to Officer Sean Leonard and his K-9, Jack (Govt. Exh. 3); a search warrant relating to the search of Chaney's cell phone (Govt. Exh. 5); an application and affidavit requesting the search warrant for Chaney's cell phone (Govt. Exh. 6); and a disc containing Chaney's recorded statement following his arrest (Govt. Exh. 7). Defendant did not present any witnesses at the evidentiary hearing; however, Defendant submitted a copy of Missouri Revised Statute 590.650.1 (Deft. Exh. A); excerpts from the 2014 Annual Report regarding Missouri Vehicle Stops by the Missouri Attorney General (Deft. Exh. B); and a form reflecting racial profiling information collected by highway patrolmen (Deft. Exh. C).

At the conclusion of the hearing, defense counsel made an oral motion for time to file a post-hearing brief. The undersigned granted that motion and, due to some technical problems with the Court's recording system, the undersigned also ordered a written transcript of the evidentiary hearing to assist in preparing this Report and Recommendation (Docs. 149 & 152). Post-hearing briefs were filed simultaneously on March 7, 2016 (Docs. 165 & 166). A transcript of the evidentiary hearing was filed on March 10, 2016 (Doc. 178).

At the close of the evidentiary hearing on February 22, 2016, defense counsel also renewed an earlier motion requesting issuance of a subpoena to the Missouri State Highway Patrol for racial profiling information collected under Mo. Rev. Stat. §590.650.2 for motor vehicle stops conducted by Trooper Johnson (Doc. 148).[1] The United States opposed the motion (Doc. 164). The undersigned

---

[1] This case was originally referred to United States Magistrate Judge Thomas C. Mummert. Following Judge Mummert's retirement in December 2015, the case was reassigned to the undersigned Magistrate Judge. Judge Mummert previously denied defendant's motion "without prejudice" on grounds that the motion was "premature". *See* Doc. 113.

granted Chaney's motion and ordered that defense counsel file any supplemental evidence on or before March 29, 2016. The United States was granted until April 5, 2016, to respond to any supplemental evidence (Doc. 168).

On March 29, 2016, Chaney filed a motion for leave to supplement the record with a written report by Richard Rosenfeld, Ph.D., analyzing the Missouri Highway Patrol racial profiling information for motor vehicle stops by Trooper Johnson in calendar year 2014 (Doc. 180). In response, the United States requested an opportunity to question Dr. Rosenfeld at a supplemental hearing before being required to file a written response to his report (Doc. 182). The undersigned granted the United States' request and held a supplemental evidentiary hearing on April 13, 2016. At the supplemental evidentiary hearing, Dr. Rosenfeld appeared and testified on behalf of Chaney. Dr. Rosenfeld was also questioned by Assistant United States Attorney Tracy Berry. Dr. Rosenfeld's report (Deft. Exh. E); the racial profiling data for Trooper Johnson on which Dr. Rosenfeld relied (Deft. Exh. F); and Dr. Rosenfeld's Curriculum Vitae (Deft. Exh. G) were also admitted into evidence at the supplemental evidentiary hearing. On April 27, 2016, the United States filed its response objecting to Chaney's motion for leave to supplement the evidentiary record and requesting that the undersigned exclude Dr. Rosenfeld's report and testimony from the evidentiary record. (Doc. 187). This Report and Recommendation will address the United States' motion to exclude the report and testimony of Dr. Rosenfeld from the evidentiary record.

Shortly after the United States filed its request to exclude Dr. Rosenfeld's report and testimony from the evidentiary record, defense counsel advised the undersigned that he did not intend to file any further response. As such, the pretrial motions are fully briefed and ready for a ruling. Based upon the evidence adduced at the hearing on the motion to suppress, as well as a review of the transcript of the hearing in this matter and the briefs of the parties, the undersigned makes the following findings of fact

and conclusions of law:

I.  **FINDINGS OF FACT**

  A.  *Traffic Stop on June 30, 2015*

On the evening of June 30, 2015, Trooper James Johnson, a thirteen year veteran of the Missouri State Highway Patrol, was stationed in a crossover median on Highway 36 at the west edge of Monroe City. At approximately 9:53 p.m., Trooper Johnson initiated a stop of a Volvo with Illinois tags for speeding. Trooper Johnson asked the driver, Laporche Clark, to accompany him to his patrol car. Clark, who appeared to be a young woman in her twenties, expressed reservation in going alone with the officer to his patrol car; but, after some reassurances from Trooper Johnson that his request was standard for Missouri highway patrol troopers, Clark acquiesced to his request. Approximately 26 minutes later, at 10:19 p.m., Trooper Johnson issued Clark a speeding ticket. After issuing the ticket, Trooper Johnson did not advise Clark that she was free to leave. Instead, he indicated that his suspicion had been aroused by statements Clark and her fellow travelers had made regarding their trip. He then left Clark sitting in his patrol car and returned to the Volvo to speak with Chaney, Barnes, and Perry.

The statements that gave rise to Trooper Johnson's suspicion stemmed from discussions he had first with Clark and then with Barnes and Chaney while preparing the traffic citation. Specifically, while he was preparing the speeding citation, Trooper Johnson asked Clark questions about where she lived, what she did for a living, the relationship between Clark and the other occupants of the car, and where they were coming from. In response to Trooper Johnson's questions, Clark stated that she lived in Glenwood, Illinois, a suburb of Chicago, and that she'd lived there all her life. She talked about her work as a home health aide and how she got into that line of work. She said that she was heading home and volunteered that she had been "out there" visiting with Darneisha Perry and Tyris Barnes, whom she described as her cousin and "his girl." When asked whether she was also related to Chaney, Clark said

he was just a friend.

Clark could not immediately recall the name of the city or state they were coming from when Trooper Johnson asked where they'd been. She said "it starts with a K; I keep saying Kentucky but it's not that it's ummm . . . it start [sic] with a K . . . I don't – umm I think it's Tennessee – no, it's not Tennessee." (Govt. Exh. 1, at 9:59:43-10:00:00.) At that point, Trooper Johnson interrupted stating "Tennessee doesn't start with a K;" to which Clark responded, "no, it's not Tennessee. I can't remember – I know it starts with a K." (Govt. Exh. 1, at 10:00:05.) A couple of seconds later, Clark recalled the name - "Kansas!" she exclaimed. *Id.* at 10:00:08. Clark told Trooper Johnson they'd been visiting "friends"; but later, she also stated they visited cousins of Tyris Barnes. *Id.* at 10:03:58-10:04:32. Clark explained that she and Barnes were related through her mother's family but the people they visited were related to Barnes through his father's family and were not really people she knew. *Id.* Although she was driving Chaney's car, Clark was unsure of the route they'd taken from Kansas. She explained that she had been following the GPS and did not drive out to Kansas; Chaney did.

At approximately 10:09 p.m., Trooper Johnson got out of his patrol car and went back to Chaney's Volvo to get the vehicle registration. While he was waiting for the registration, Trooper Johnson asked the other three passengers about their trip. When he asked where they were coming from, one of the two male passengers answered, without hesitation, that they were coming from Kansas City where they'd been "visiting" and were headed back home. *Id.* at 10:09:33-10:09:41. Although Trooper Johnson attempted to ask additional questions about the trip, he was interrupted by Chaney, who leaned forward from the back driver's side seat to help Barnes locate the registration. At 10:11 p.m., Trooper Johnson obtained the registration from Chaney's vehicle and returned to his patrol car.

At 10:13 p.m., after inputting additional information into the computer in his car, Trooper Johnson advised Clark of the following: he stopped her for speeding well in excess of 10 miles over the

speed limit; he checked her driver's license to see if there were any issues such as driving while suspended and found no such issues; initially, there was an issue with the vehicle registration because Chaney had only recently purchased the Volvo; however, the registration checked out as well. By this point, Trooper Johnson had run a criminal history on Clark and he had determined that she had a valid driver's license and no outstanding warrants. Trooper Johnson had also determined that the Volvo was registered to Chaney who, though not driving, was present as a passenger in the vehicle. Trooper Johnson told Clark that, in light of the high rate of speed, he was going to be issuing a speeding ticket.

While completing the ticket, Trooper Johnson continued to press Clark for details about her trip asking, among other things, what she did while in Kansas, whether she was in or near Lenexa, whether she had been in a big city or small town, and whether she was in Missouri or Kansas. Clark responded that she really didn't know the name of the city but explained it was a bigger city where they had to get on the expressway whenever they needed to go to a store. When pressed about whether they'd been in Kansas or Missouri, Clark stated they were in Kansas but answered "no" when Trooper Johnson asked "it wasn't Kansas City?" (Govt. Exh. 1, at 10:16:15-10:16:25.) Trooper Johnson then asked her what she would say if he told her that the other passengers said they'd been in Kansas City. Clark responded that she saw no difference between Kansas and Kansas City. At approximately 10:17 p.m., Trooper Johnson printed out the traffic citation and returned Clark's driver's license and Chaney's vehicle registration to Clark.

After handing Clark the citation and explaining how she could go about challenging it or paying the fine, at approximately 10:20 p.m., Trooper Johnson continued to ask Clark about the origin of her trip including what time they left Kansas, whether they made any stops along the way, and how long they had been driving. Clark seemed unsure of exactly when they had left Kansas but indicated they left around 5 or 6 p.m. and stopped once for gas. At that point, Trooper Johnson stated he was concerned

that Clark was unsure of what city she'd been in for the past three days. Clark explained she was not particularly interested in the city and, essentially, just went along for the ride. Trooper Johnson told Clark he needed to speak some more with the other passengers to "verify" with them about the trip. He said he was "really confused" about the cities and the trip and wanted to speak with the other passengers. He left Clark sitting in the patrol car after saying he would "get back" with Clark once he spoke with the other passengers.

Trooper Johnson returned to the Volvo and, despite the relatively minor discrepancies between the two accounts, Trooper Johnson advised the occupants that their story was not matching up with Clark's. For the next three minutes, he questioned them about the purpose of their trip and the different places they visited. The dashboard camera video reflects that the two males in the car, Chaney and Barnes, both responded to the officer's questions at different points. During this exchange, Trooper Johnson did not indicate to the other passengers that he had already issued Clark a speeding ticket and returned Clark's driver's license and Chaney's vehicle registration to Clark.

Following this exchange, at approximately 10:23 p.m., Trooper Johnson called for backup and then returned to his patrol car. He advised Clark that, after talking with the other passengers, he was even more confused about their trip. Trooper Johnson told Clark that her story was "utterly different" from that of the other passengers. Clark asked "what's their story?" Trooper Johnson would not say. He merely said it was completely different and attempted to further pin down discrepancies. Clark then asked what the discrepancies in their travel itinerary had to do with the speeding ticket. Trooper Johnson acknowledged that the speeding ticket was a separate matter but said "once I get past that traffic violation, if something just doesn't seem right to me then I start questioning it." (Govt. Exh. 1 at 10:24.) He indicated that part of his job is to "dig a little deeper" to see if there's something else going on other than just the speeding ticket because, for all he knew, there could "be a dead body [he's] missing." *Id.*

He then asked, perhaps partially in jest, if there were any dead bodies in the car.

Trooper Johnson ultimately explained that the other passengers confirmed that they went to Kansas, but gave a location different from what she said; they also gave a different reason for the trip than she did; and their description of the relationships between Clark and the others differed from Clark's description. Trooper Johnson explained that those discrepancies led him to believe that there was something they were trying to hide. However, Trooper Johnson's statements to Clark about discrepancies between her account of the trip and the account of the other passengers are not entirely supported by the video evidence of record. The video recording is difficult to hear but, in sum, it shows that when Trooper Johnson returned to the Volvo around 10:23 p.m., Barnes and/or Chaney confirmed that they had visited "Kansas City." They were vague about who they were visiting. One of the two men stated they "had some people over there" and they were going back home. At one point, one of the two men stated they had "no family members over there;" one man also stated Clark was a "friend" and they were "all friends." Govt. Exh. 1 at 10:22-10:23. At the hearing, Trooper Johnson testified that Barnes was the person who said "we are all friends" and we have "no family members over there." However, in reviewing the dashboard camera video, it appears that it was Chaney who stated from the back seat "we have no family members over there." *Compare* Hearing Tr. at p. 18 *with* Govt. Exh. 1, at 10:22:44-49. To the extent statements such as "we have no family members over there" or "we are all friends" were made by Chaney, they are not inconsistent with Clark's statements to Trooper Johnson.

In light of the perceived discrepancies between Clark's account of the trip and that of the other travelers, Trooper Johnson asked Clark if they had been engaged in criminal activity while over in Kansas City. He asked if there was any contraband in the car including drugs, more than $10,000 in currency, or credit cards. At approximately 10:27 p.m., he asked Clark for consent to search the car. Clark denied that she'd been involved in any criminal activity and denied that there was any contraband

in the car. Clark did not directly respond to Trooper Johnson's request for consent to search. Instead, Clark stated they were trying to get home and again asked what any of this had to with her speeding ticket. Trooper Johnson once again indicated that his suspicion had been aroused and he was questioning the reasons for the trip.

At approximately 10:28 p.m. the backup arrived, with lights activated. Trooper Johnson once again left Clark in the patrol car indicating that he needed to speak with the officer who had just arrived at the scene. Trooper Johnson is heard on the dashboard camera video explaining to the backup officer that "they're showing a bit of nerves" and "have utterly different stories." After that point, Trooper Johnson turned off his microphone; as such, there is no record of what he and the backup officer discussed. At approximately 10:29 p.m., Trooper Johnson turned his microphone back on and is heard advising the backup officer that "the guys in the car are getting frustrated."

At 10:30 p.m. Trooper Johnson returned to the patrol car. After stating that he had given Clark his reasons for believing there was criminal activity afoot, Trooper Johnson asked Clark a second time for consent to search. At that point, Clark explicitly stated that she would not consent. At this point, Clark's frustration was visible. She indicated she had never previously been intimidated or questioned to this extent about a speeding ticket. Expressing apparent disagreement that Trooper Johnson was justified in extending the traffic stop, at approximately 10:31 p.m., Clark asked if there wasn't someone, "a sergeant," a "white shirt" she could speak with. Trooper Johnson indicated that he'd be willing to call a supervisor and left Clark sitting in the patrol car once again.

Once he exited the patrol car, Trooper Johnson, again, turned off his microphone. According to his hearing testimony, Trooper Johnson called for a supervisor around 10:35 p.m. But before he did that, he called for a canine unit to respond to the scene. At approximately 10:35 p.m., Trooper Johnson returned to the Volvo to update Chaney and the others about what was transpiring. Although Trooper

Johnson knew that Chaney was the owner of the Volvo, he did not ask Chaney for consent to search the Volvo. Trooper Johnson also testified at the evidentiary hearing that he never asked either Chaney or Clark for consent to wait for a drug sniffing dog. Hearing Tr. at 43. Instead, according to Trooper Johnson's hearing testimony, he advised the occupants of the Volvo that they had conflicting stories; that he had observed nervousness; that Clark had denied consent; and that he had called for a canine unit. Hearing Tr. at 25.

When asked at the hearing what he suspected when he called for a drug sniffing dog, Trooper Johnson testified that it was "kind of hard to determine what [he] suspected" but based on his experience "[t]ypically, most traffic stops end in a drug arrest." Hearing Tr., at p. 50. Although Trooper Johnson testified that he was suspicious that all of the contraband he asked Clark about, namely, marijuana, methamphetamine, cocaine, heroin, weapons, more than $10,000 in currency, and credit cards, might be in the Volvo, he acknowledged that a drug sniffing dog could not have detected unauthorized credit cards. *Id.* at 50-51.

At approximately 10:36 p.m., Clark tapped on the window of the patrol car to get the attention of the backup officer, who was standing immediately outside the passenger door. When the officer opened the door, Clark stated she didn't understand why they had to stay there. The officer mumbled something that was inaudible on the video (but clearly not a green light for Clark to leave) and closed the door. At approximately 10:39 p.m., Trooper Johnson returned to the patrol car and advised Clark that his boss was coming over to talk to her. He further advised Clark that he had called a canine unit; they had "moved beyond a traffic stop" and they were "being detained."

At approximately 10:40 p.m., Trooper Johnson observed that Barnes stuck his hand out of the passenger window or made a waving motion with his hand multiple times. Trooper Johnson asked the backup officer to move closer to the Volvo to make sure they weren't "throwing." The backup officer

complied with Trooper Johnson's request and moved closer to the Volvo. The dashboard camera supports Trooper Johnson's testimony that he observed Barnes' hand coming out of the window. But there is no evidence to suggest that Barnes did throw anything out of the Volvo. There is nothing visible leaving Barnes's hand on the dashboard camera video, and there is no evidence that the backup officer observed anything on the ground near or around the Volvo. In fact, Trooper Johnson testified that he never even bothered to search the area for any contraband after the passengers were taken into custody. All of this suggests that the officers did not suspect that any contraband was thrown.

At approximately 10:54 p.m., Trooper Johnson's supervisor, Sergeant Bartles, arrived and began speaking with Clark about the traffic stop. In response to Clark's complaints about being detained, Sergeant Bartles echoed many of the reasons already given by Trooper Johnson for extending the stop. The canine unit, Deputy Leonard and canine partner, Jack, arrived at approximately 10:57 p.m. At that point, Trooper Johnson asked all of the passengers, including Chaney, to get out of the Volvo before Jack inspected the exterior of the car. In circling the exterior of the Volvo, Jack alerted by sitting down or stopping multiple times. Based on the dog alert, the officers searched the Volvo. No drugs were found, but officers seized items from the trunk of the car including approximately 64 cloned credit cards, $15,000 worth of store gift cards, forms of identification, and large quantities of newly purchased store merchandise. Cell phones belonging to all four occupants were also seized. Although the names of each of the other three occupants appeared on cloned access devices, Chaney's name did not appear on any of the cloned credit cards. Following the search, all four occupants of the Volvo were arrested for identity theft and money laundering. They were taken into custody a little after midnight on July 1, 2016.

## B. *Chaney's Post-Arrest Statement*

At approximately 5:40 p.m. on July 1, 2015, Chaney was interviewed by FBI Special Agent Keith Kohne and Sergeant Brad Ream of the Missouri State Highway Patrol. Agent Kohne confirmed

that Chaney had graduated from high school and could read and understand English. He then advised Chaney of his *Miranda* rights by reading the rights from a written form. Chaney indicated he understood his rights and initialed each right as Agent Kohne reviewed it. After being advised of his *Miranda* rights, Chaney signed a written waiver of his *Miranda* rights. Chaney subsequently answered questions and asked questions for approximately 15 minutes. During the brief interview, Chaney stated that he had met Perry and Clark a few months before and he knew them "from the neighborhood." He stated he had known Barnes for years and had met him in school. Chaney stated he went out of town just to get out of Chicago and insisted that, despite the presence of the contraband items seized from his car, he had no involvement in trafficking or stealing identities.

After about 15 minutes, Chaney indicated that he had been in trouble many years ago and knew he'd eventually be appointed a lawyer; he then stated he didn't see how talking to the agents would help him. He said he'd prefer to explain things to a public defender or other lawyer rather than to the agents. After confirming that Chaney did not wish to continue the interview without a lawyer, the officers ended the interview.

## C. *Search Warrant for Chaney's Cell Phone*

On July 2, 2015, Sergeant Ream prepared an Affidavit and Application for a search warrant authorizing the search of cell phones owned by Chaney, Barnes, Clark and Perry. (Govt. Exh. 6). The search warrant application averred the following: Chaney, Barnes, Clark and Perry had been arrested on June 30, 2015, for multiple counts of trafficking in stolen identities and money laundering; 64 cloned credit cards and $14,980 in gift cards were located inside of the vehicle; the names of Barnes, Clark and Perry were on multiple cloned credit cards; Chaney is the registered owner of the vehicle used to transport the fraudulent credit cards, purchased gift cards and purchased merchandise; although Barnes, Perry, and Clark admitted during post-arrest interviews that they used their cellular phones in the

scheme to obtain and use the counterfeit cards, Chaney denied involvement with the credit cards; however, six two hundred dollar gift cards were located in a bag which also contained a utility bill and insurance document for Chaney.

Sergeant Ream presented the application and affidavit to a judge in the Circuit Court of Macon County, Missouri. The judge authorized a search of the cell phones for evidence of commission of a crime including communications with potential witnesses or suspects, photographs, audio recordings, voicemail messages, and any other electronic information concealed in the telephone. *See* Govt. Exh. 5. According to the search warrant return, the officers successfully downloaded data from Chaney's cell phone. *See id.*

<h3 align="center">CONCLUSIONS OF LAW</h3>

## I. GOVERNMENT'S MOTION TO EXCLUDE REPORT AND OPINIONS OF DR. ROSENFELD (DOC. 187)

Chaney has offered opinions from Dr. Richard Rosenfeld and Missouri State Highway Patrol (MHSP) Data relied on by Dr. Rosenfeld as additional evidence in support of his motions to suppress. Dr. Rosenfeld is a professor of Criminology and Criminal Justice at the University of Missouri, St. Louis, and one of three researchers in the State of Missouri responsible for compiling and analyzing racial profiling data sent by Missouri law enforcement agencies to the Missouri Attorney General. At the supplemental evidentiary hearing, Dr. Rosenfeld testified that he analyzed MSHP data for Trooper Johnson and it was his opinion that the MSHP data for Trooper Johnson shows that Trooper Johnson was more likely to search a vehicle driven by an African American driver than a vehicle driven by someone who is not African American. However, Dr. Rosenfeld also testified that he was offering no opinion regarding Trooper Johnson's credibility and he could not say that Trooper Johnson's decision to extend the traffic stop was motivated by race.

The United States contends that Dr. Rosenfeld's opinions and the facts and data underlying those

opinions should be excluded from the evidentiary record because they (i) are not admissible under the Federal Rules of Evidence; (ii) are irrelevant to the narrow Fourth Amendment issue before this Court; (iii) are unreliable; and (iv) fail to demonstrate that Trooper Johnson was motivated by a discriminatory purpose. (Doc. 187). I agree that, given the narrow issue before the Court, Dr. Rosenfeld's opinions and testimony have little or no probative value. However, for the reasons stated below, I disagree with the contention that Dr. Rosenfeld's opinions, testimony, and the underlying MSHP data should be excluded from the evidentiary record.

"[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." *United States v. Henderson,* 471 F.3d 935, 938 (8th Cir. 2006) (quoting *United States v. Matlock,* 415 U.S. 164, 172-73 (1974) (discussing Fed. R. Evid. §§ 104(a), 1101(d)); *see also United States v. Raddatz,* 447 U.S. 667, 679 (1980) ("[T]he interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself. At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."). Here, Chaney contends that Dr. Rosenfeld's opinions are relevant to Trooper Johnson's credibility. Specifically, Chaney argues that the MSHP data and Dr. Rosenfeld's analysis of that data make Trooper Johnson's reasons for expanding the traffic stop less plausible. Although the undersigned tends to agree with the United States's assessment that Dr. Rosenfeld's opinions and related evidence have little or no probative value with regard to Trooper Johnson's credibility, the undersigned recognizes that other reviewing judges may disagree. Excluding the evidence proffered by Chaney would deprive future reviewing judges of the ability to assess whether or not this evidence has any probative value. The United States has offered no compelling reason or authority for doing so.

The undersigned is also not persuaded that the MSHP data upon which Dr. Rosenfeld relied is

irrelevant for all purposes. The data, which all Missouri highway patrolmen are required to report, captures a wide range of information about the nature and results of motor vehicle stops conducted by the state trooper including whether there was a search, whether an arrest resulted from the stop, and, if so, the crime charged. Courts frequently consider an officer's experience when assessing whether facts that might otherwise seem innocuous to a lay person are suspicious in the eyes of an experienced police officer. *See, e.g., United States v. Lebrun,* 261 F.3d 731, 733 (8th Cir. 2001) (holding that officer's thirteen years of experience as a law enforcement officer could not be lightly disregarded in determining whether he had a reasonable suspicion to conduct the seizure). While it is far from a complete picture, the MSHP data gives a snapshot into the trooper's experience in handling motor vehicle stops— experience that the undersigned cannot say is irrelevant to a Fourth Amendment analysis.

That being said, although Chaney has broadly asserted that Dr. Rosenfeld's opinions are somehow probative of Trooper Johnson's credibility, Chaney has failed to articulate ***why*** those opinions are probative. As the United States has correctly pointed out, Chaney has not made a claim that Trooper Johnson's decision to extend the traffic stop and search was racially motivated.[2] Nor has Chaney explicitly alleged, as the United States suggests, that the reasons given by Trooper Johnson for his suspicion were a pretext for a racially-motivated decision to expand the stop. Even if Chaney did make such a claim, the doctor's opinions would have little to no probative value. As the United States has correctly pointed out, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *United States v. Gunnell,* 775 F.3d 1079, 1083 (8th Cir. 2015) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)) (alteration in original); *see also United States v. Frasher*, 632 F.3d 450, 453-54 (8th Cir. 2011). Chaney has not suggested that this case involves anything any other than an "ordinary" Fourth Amendment analysis. Nor has Chaney suggested that he is offering Dr.

---

[2] Given Dr. Rosenfeld's testimony that he could not say the decision to search was based on race, the undersigned doubts that Chaney could base an equal protection claim on Dr. Rosenfeld's opinions.

Rosenfeld's opinions as evidence of something other than the officer's "subjective intentions."[3] Under the circumstances presented in this case, the undersigned finds that Dr. Rosenfeld's opinions have little to no probative value with regard to Trooper Johnson's credibility and no probative value regarding whether there was or was not reasonable suspicion to extend the traffic stop. As such, the undersigned has not relied on Dr. Rosenfeld's opinions in resolving any of the legal issues addressed in this Report and Recommendation.

However, for all of the foregoing reasons, the undersigned will deny the United States' request to exclude Dr. Rosenfeld's opinions and the additional related documents offered by Defendant from the evidentiary record.

## II.  MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (DOCS. 92 & 93)

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is well established that "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Gunnell,* 775 F.3d 1079, 1083 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Whren v. United States,* 517 U.S. 806, 809-10 (1996)). The decision to stop an automobile is generally reasonable where the police have probable cause to believe that a traffic violation has occurred. *Id.* The Eighth Circuit has repeatedly held:

> [I]f a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. Occupants . . . may be detained while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. These tasks

---

[3] Although it is far from clear, in reading between the lines of Chaney's argument, it appears that Chaney might have been attempting to offer the racial profiling data and Dr. Rosenfeld's opinions as evidence of ***implicit*** as opposed to intentional bias by Trooper Johnson. Although research has revealed a number of scholarly articles that advocate for the use of implicit bias evidence in evaluating alleged Fourth Amendment violations, the undersigned has found no authority in the case law for doing so.

can include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning. The officer may also ask questions about the occupant's travel itinerary.

*Id.* at 1083-84 (quoting *United States v. Ovando–Garzo,* 752 F.3d 1161, 1163 (8th Cir. 2014)).

However, it is equally well-settled that detention for a traffic violation "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). As such, "once an officer finishes the tasks associated with a traffic stop, the purpose of the traffic stop is complete and further detention . . . would be unreasonable unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention." *Gunnell,* 775 F.3d at 1083-84 (quoting *Ovando-Garzo*, 752 F.3d at 1163-64). "Whether a detention is reasonable is a fact-intensive question which is measured in objective terms by examining the totality of the circumstances." *Id.* at 1084.

In *Rodriguez v. United States,* the Supreme Court held that, unlike routine tasks such as checking a driver's license, a dog sniff is not an ordinary incident of a traffic stop. 135 S. Ct. 1609, 1615 (2015). It "is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* (internal quotation marks omitted). Because it lacks the same close connection to roadway safety as ordinary traffic stop inquiries such as the validity of a driver's license, proof of insurance, and automobile registration, a dog sniff is "not fairly characterized as part of the officer's traffic mission." *Id.* During an otherwise lawful traffic stop, an officer may conduct certain inquiries, like a dog sniff, that are unrelated to the traffic stop; however, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

In this case, Chaney does not dispute that Trooper Johnson had probable cause to stop his Volvo for speeding. Instead, Chaney contends that Trooper Johnson did not have reasonable suspicion to extend the stop beyond 10:19 p.m., which is the time Trooper Johnson issued the speeding ticket to

Laporche Clark. The United States contends the traffic stop was still ongoing when the canine unit arrived at 10:57 p.m. because Clark requested to speak to a supervisor and she was still speaking to the supervisor about the details of the traffic stop when the canine unit arrived. *See* Govt. Response (Doc. 96), at p. 9. This argument is disingenuous in light of the evidence.

**A.** ***The Initial Purpose of the Traffic Stop Was Not Continuing After Trooper Johnson Issued the Citation.***

Based on the foregoing factual findings, between 9:53 p.m. and 10:19 p.m., Trooper Johnson performed all of the inquiries that are typically associated with a traffic stop. During that time, he asked Clark to sit in the patrol car, checked the validity of Clark's license, checked for outstanding warrants, and checked the vehicle registration. *See Rodriguez,* 135 S. Ct. at 1015 (noting that ordinary inquiries incident to a traffic stop include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance); *Gunnell,* 775 F.3d at 1083 (routine but somewhat time-consuming tasks related to the traffic violation can include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning). Trooper Johnson also asked Clark and the other passengers, including Chaney, about their itinerary.

At 10:19 p.m., Trooper Johnson handed Clark her driver's license, Chaney's vehicle registration, and the traffic citation, and explained how she could resolve the speeding ticket. Although Clark did request to speak to a "white shirt" or supervisor, she did so only after it became clear that Trooper Johnson was not going to permit them to leave after he issued the traffic ticket. It is also apparent from the evidence that, given the opportunity, Clark would have left without speaking to a supervisor. Specifically, at approximately 10:36 p.m., while Trooper Johnson was still outside of the patrol car, Clark got the attention of the backup officer and asked him why they had to stay there. The officer's body language and tone made it clear that Clark could not leave, and he closed the door after responding

to Clark's question. At approximately 10:39 p.m., Trooper Johnson returned to the patrol car and advised Clark that his boss was coming over to talk to her. He further advised Clark that he had called a canine unit. He told her they had "moved beyond a traffic stop" and they were "being detained."

The foregoing facts demonstrate that even Trooper Johnson did not believe the initial purposes of the traffic stop were ongoing after he issued the traffic citation. His statements "once I get past that traffic violation" and we have "moved beyond a traffic stop" make that belief explicit. In sum, based on the factual findings and the evidence of record in this case, at 10:19 p.m., when Trooper Johnson handed Clark her driver's license, Chaney's vehicle registration and the traffic citation, the traffic stop and its related tasks were completed. As such, it would have been "an unreasonable extension of the scope of the investigation for Trooper [Johnson] to further detain [Clark] or [Chaney's] vehicle," unless the encounter was consensual or something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention. *Jones,* 269 F.3d at 925.

**B.** ***The Post-ticket Encounter Between Chaney and Trooper Johnson Was Not Consensual.***

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Jones,* 269 F.3d at 925. "The determination of which police-citizen contacts fall within the regulation of the Fourth Amendment and which do not is a fact intensive one which turns upon the unique facts of each case." *Id.* Circumstances indicative of a seizure include the threatening presence of several officers, the display of a weapon, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.* at 925-26. *See also United States v. Beck,* 140 F.3d 1129, 1135 (8th Cir. 1998). An encounter is not consensual when an officer makes it evident from his use of language and conduct that the motorist would not be free to leave without first complying with the officer's demands, and the motorist submits

to that show of authority. *Jones,* 269 F.3d at 926.

      In this case, Defendant contends that neither Clark nor Chaney nor any of the other occupants consented to an expansion of the initial traffic stop or consented to wait for a drug sniffing dog to arrive. The United States does not contend otherwise. Indeed, the facts do not support an argument that the encounter was consensual. Specifically, when Trooper Johnson handed Clark the citation and her documents at 10:20 p.m., he did not tell her that she was free to go. Instead, he continued to ask Clark about the origin of her trip. He left Clark seated in the patrol car after telling her he was going to speak further with the other passengers and that he would "get back" with Clark. When Trooper Johnson approached Chaney and the other passengers, he did not tell them they were free to go or otherwise advise that he had already issued the traffic ticket and now just wanted them to answer some additional questions. Instead, he continued to ask them questions. Although Trooper Johnson returned Clark's driver's license and Chaney's vehicle registration, at no point following issuance of the speeding ticket did Trooper Johnson permit Clark, the driver, to return to the vehicle. As such, at no point did Chaney or Clark have everything they needed to continue their trip. *Contra Beck,* 140 F.3d at 1135 (holding encounter consensual when officer returned driver's license and registration to motorist who was seated in his own car and told him he was free to go but then officer continued asking motorist questions).[4]

      In addition, although he was aware that Chaney owned the Volvo, Trooper Johnson never asked Chaney for his consent to search the Volvo. Trooper Johnson neither requested nor received consent from Clark or Chaney to wait for a canine unit; rather, he advised them in declarative terms that he called for a canine unit. In sum, these facts present a nonconsensual encounter in which motorists

---

[4] Even if an argument could be made that the encounter was consensual after Trooper Johnson returned Chaney's vehicle registration and Clark's driver's license to Clark, the consensual nature of the encounter ended at the latest when Clark refused to a search and Trooper Johnson called for a canine unit. *See, e.g., Beck,* 140 F.3d at 1136 (consensual nature of encounter ended when after defendant refused to consent to a search of his vehicle the officer called for a drug sniffing dog).

"submitted to a show of authority by an officer who made it evident from his use of language and conduct that the motorist[s] would not be free to leave without first complying with the officer's demands." *Jones,* 269 F.3d at 926. Because the encounter after issuance of the speeding ticket was not consensual, the expansion of the investigation and extension of the traffic stop was lawful only if it was supported by reasonable articulable suspicion that Chaney and the others were engaged in criminal activity.

**C.** ***Trooper Johnson Did Not Have Reasonable Suspicion to Extend the Stop.***

"An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). *See also United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) ("If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense."). However, the officer's suspicion must be based upon "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Jones,* 269 F.3d at 927 (quoting *United States v. Beck,* 140 F.3d 1129, 1136)) (8th Cir. 1998)). An "inchoate and unparticularized suspicion or hunch" is insufficient. *Terry v. Ohio,* 392 U.S. 1, 27 (1968) (internal quotation marks omitted). In determining whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion—the whole picture, i.e., the "totality of the circumstances" must be taken into account. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *Jones,* 269 F.3d at 927. The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on

circumstances which describe a very large category of presumably innocent travelers." *Jones,* 269 F.3d at 927 (internal quotation marks omitted) (quoting *Reid v. Georgia,* 448 U.S. 428, 441 (1980)).

"An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *Linkous*, 285 F.3d at 720. However, if by the time the tasks tied to the traffic infraction have been completed, the officer's suspicion does not stem from particularized, objective facts upon which a suspicion of criminal activity may reasonably rest, the officer violates the Fourth Amendment by detaining the motorist. *See Rodriguez,* 135 S. Ct. at 1614-15. *See also Jones,* 269 F.3d at 927 ("Only when an officer develops a reasonable, articulable suspicion that criminal activity is afoot does he have justification for a greater intrusion unrelated to the traffic offense.") (internal quotation marks omitted). "Finding a quantum of individualized suspicion only *after* a stop occurs cannot justify the stop itself." *United States v. Yousif,* 308 F.3d 820, 828 (8th Cir. 2002) (emphasis in original).

In this case, the United States argues that Clark's vague and inconsistent statements coupled with her alleged nervousness gave rise to the requisite reasonable suspicion. I disagree. Based on the factual findings, at the point that Trooper Johnson completed his traffic-related tasks, the travelers' statements about where they were coming from—Kansas City—and why they had traveled there—to visit—were not inconsistent. Moreover, there is nothing inherently suspicious about Clark's initial inability to recall the name of the city they'd been visiting beyond the letter it started with. A lot of law abiding citizens are bad with geography and have lapses of memory. Given the proximity of Kansas City, Missouri to Kansas City, Kansas, and given that there is no obvious boundary between the two cities, there is also nothing inherently suspicious about someone like Clark who, apparently had never been to the Kansas City metropolitan area before, having difficulty distinguishing between the state of Kansas, Kansas City,

Missouri, and Kansas City, Kansas.[5]

The foregoing facts distinguish this case from cases like *Lyons,* 486 F.3d at 370, where the defendant described an unusual and complicated travel itinerary involving the rental of multiple vehicles and defendant also contradicted himself, first, by stating that he had been visiting friends at Arizona State University and then later stating that the friends did not attend the University. Even if the statements in this case could be construed as inconsistent or somehow contradictory, standing alone, they are not sufficient to support a finding of reasonable suspicion. Although inconsistent answers regarding the details of a trip could support a finding of reasonable suspicion to expand a traffic stop, courts have generally reached that conclusion when there are other specific articulable facts that simply are not present in this case. *See, e.g., Lyons,* 486 F.3d at 370 (inconsistent statements coupled with complicated unusual itinerary); *United States v. Lebrun,* 261 F.3d 731, 734 (8th Cir. 2001) (inconsistent answers regarding details of trip coupled with unusually nervous behavior, profuse sweating in cold temperature, and other factors); *United States v. Foley,* 206 F.3d 802, 806 (8th Cir. 2000) (inconsistent answers between driver and passenger regarding whether they flew or drove to the city they were driving from coupled with driver's inability to recall name of the daughter-in-law who supposedly rented the car and "masking odors" in the car); *United States v. Edmisten,* 208 F.3d 693, 694 (8th Cir. 2000) (driver's inability to recall the last names of passengers he claimed he had known for years coupled with statements by passengers that conflicted with driver's suspicious statement; and officer's

---

[5] The undersigned recognizes that, after Trooper Johnson issued the ticket to Clark, Barnes and/or Chaney made statements about whether they had been visiting "friends" or visiting "family" in Kansas City. Chaney and/or Barnes also made a statement that they—the travelers—were "all friends." These statements may have appeared to Trooper Johnson to be inconsistent with statements Clark had made. However, those statements were made after Trooper Johnson had completed the tasks related to the traffic stop. Like all of the other events that occurred after Trooper Johnson decided to extend the stop, those facts cannot be considered as justification for extending the stop. However, even if statements by Barnes and/or Chaney about their relationship to the people they were visiting and to each other were considered as part of the totality of the circumstances, when taken together with all of the other circumstances in the case, those statements do not add up to particularized objective facts that warrant suspicion that any crime, including a drug-related crime, was being committed.

belief that the passengers fit the description of individuals suspected of assault). In the absence of other factors suggesting Clark and/or Chaney were engaged in drug or other criminal activity, Clark's allegedly vague and inconsistent statements could not generate a reasonable suspicion that criminal activity was afoot.

With respect to the argument that Clark exhibited signs of nervousness, the undersigned concludes this argument is not supported by the evidence. At the evidentiary hearing, Trooper Johnson testified his suspicions were aroused by Clark's nervous mannerisms, and he pointed to examples from the dashboard camera video. However, a review of the entire video undercuts that testimony in at least two respects. First, when Trooper Johnson asked Clark to accompany him to his patrol car, Clark, who appeared to be a young woman in her twenties, expressed great reservation in going alone with the officer to his patrol car. After some reassurances from Trooper Johnson, Clark acquiesced to his request. Particularly when Clark's initial reluctance to accompany Trooper Johnson back to his patrol car alone is taken into account, Clark appears remarkably composed and calm throughout the video. For example, during the course of their initial conversation, Clark frequently turned her body toward to the officer to repeat an answer to his question when it appeared he did not hear her. She even appeared to be smiling in an embarrassed manner when she could not recall the name of the city she'd been visiting. From time to time on the video Clark is seen rubbing her face or eye, scratching her hair, and/or scratching or rubbing her arm and/or turning away from Trooper Johnson. However, these movements to not occur with any frequency and are not obviously correlated with any particular questions asked by the officer. Overall, the movements identified by Trooper Johnson as nervous mannerisms do not detract from the general impression that Clark was relatively relaxed during her interaction with Trooper Johnson.

Second, in the video, it appears that Trooper Johnson was not looking at Clark during most of the questioning about her background and itinerary. Although Trooper Johnson was partially obscured on

the video, a viewer can see enough of Trooper Johnson to observe that for most of his exchange with Clark, Trooper Johnson was seated next to Clark and was either looking down (perhaps at his computer), looking away from Clark, or otherwise looking straight ahead. Based on the undersigned's observations of the video and Trooper Johnson at the hearing, Trooper Johnson's hearing testimony that Clark appeared nervous when answering questions about the origin of her trip appears to be more the product of an after-the-fact review of the video than his personal observations during the traffic stop.

Even if the actions Trooper Johnson described constituted acts of nervousness he actually observed during the traffic stop, nervousness in general "is of limited significance in determining reasonable suspicion. *Jones,* 269 F.3d at 928 (quoting *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994)). "[I]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." *Id.* at 929 (quoting *Beck*, 140 F.3d at 1139). This is particularly true where, as here, Trooper Johnson did not describe unusual, exceptional, or more objective manifestations of nervousness that might, in combination with other facts, support a finding of reasonable suspicion. *See id.*

In sum, whether considered individually or in combination, the facts presented here cannot justify the expansion of the stop, because "too many people fit [Trooper Johnson's] description for it to justify a reasonable suspicion of criminal activity." *Yousif,* 308 F.3d at 828-29. The nervousness described by Trooper Johnson could describe a large number of innocent people. Similarly, the so-called inconsistent and vague statements by Clark could have been made by many presumably innocent travelers traveling in a group of people who share varying degrees of intimacy. "[I]t is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Jones,* 269 F.3d at 929 (quoting *Beck*, 140 F.3d at 1137).

The circumstances surrounding this traffic stop simply do not bear the hallmarks of a case in which reasonable suspicion of narcotics possession or any other criminal activity exists. Other than the fact that Clark was speeding, nothing about the traffic-related investigation suggested that anything was amiss. Clark's driver's license was valid and she had no outstanding warrants. The vehicle was neither stolen nor a rental that had been rented by someone who was not present. The vehicle registration check confirmed that the vehicle was owned by Chaney who was present in the vehicle.

Indeed, this case is most striking for what facts are not present. In stark contrast to cases in which reasonable suspicion of drug activity has been found, here, there is no evidence that Trooper Johnson was patrolling a known drug trafficking route or that Clark and Chaney and the others were coming from or heading to a city known for narcotics trafficking. *See, e.g., United States v. McCarty,* 612 F.3d 1020, 1025 (8th Cir. 2010) (officer's reasonable suspicion to expand the traffic stop to investigate whether defendant was transporting narcotics was justified in part by defendant's compressed travel schedule along a known drug route and atypical nervousness). Nor is there any evidence that Trooper Johnson had some prior knowledge or warning via a bulletin, police alert, or informant that would cause him to be on the lookout for four people in a Volvo heading in the direction of Chicago, Illinois or coming from the Kansas City area. *See, e.g., United States v. Stringer,* 739 F.3d 391, 395 (8th Cir. 2014) (officer had reasonable suspicion to extend a traffic stop  where officer was part of the local drug task force and had observed defendant's vehicle leaving a house known for drug transactions and observed during the traffic stop that defendant had "very dilated" pupils). There is also no evidence that Trooper Johnson smelled the odor of any drug or alcohol or excessive fragrance that could mask the odor of those substances either on Clark or in Chaney's vehicle. *See, e.g., Foley,* 206 F.3d at 806 (masking odor coupled with inconsistent answers and other factors support reasonable suspicion finding).

Trooper Johnson's testimony that it is "hard to determine what [he] suspected" when he decided to call for a drug sniffing dog is very telling. So is Trooper Johnson's testimony that he suspected he would find all of the things he asked Clark about if he searched the Volvo—namely, marijuana, methamphetamine, cocaine, heroin, weapons, more than $10,000 in currency, and credit cards. That suspicion did not arise because of any specific, objective fact that occurred during the traffic stop. Rather, according to Trooper Johnson, it was based on his experience, that "most traffic stops end in a drug arrest." Although it is appropriate for the Court to consider, and even defer, to an officer's experience in determining whether otherwise innocent-seeming facts give rise to reasonable suspicion, in this instance the undersigned is reluctant to defer to Trooper Johnson's conclusion. The 2014 Missouri State Highway Patrol data suggests that, at least in the year 2014, only 5 out of 450 traffic stops by Trooper Johnson ended in a drug-related arrest. *See* Deft. Exh. F. As such, at least in the year before he stopped Chaney, Trooper Johnson's experience could not have reasonably led him to believe that most traffic stops end in a drug arrest.

The undersigned acknowledges that in some circumstances the sum of a reasonable suspicion analysis may amount to more than its parts. However, whether viewed alone or in combination, the facts in this case—minimal, if any, nervousness and statements that were marginally inconsistent, if at all— amount to very little. The United States has failed to offer a concrete reason why circumstances that could apply to a broad array of presumably innocent motorists should be interpreted as suspicious criminal activity. Therefore, the undersigned concludes that Trooper Johnson did not have reasonable suspicion to detain Chaney.

**D. *Chaney's Statements, and Evidence Seized From Chaney's Volvo and Cell Phone, Must Be Suppressed.***

Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial to prove a defendant's guilt. *Elkins v. United States,* 364 U.S. 206, 223-24 (1960)

(evidence obtained as the result of an unreasonable search and seizure by state officers cannot be used against defendant in federal court). The purpose of the exclusionary rule is to deter constitutional violations. *See United States v. Leon,* 468 U.S. 897, 906 (1984). A court may admit evidence that would not have been discovered but for official misconduct only if the causal connection between the illegal conduct and the acquisition of the evidence is sufficiently attenuated to purge the evidence of its initial taint. *See Wong Sun v. United States,* 371 U.S. 471, 487-88 (1963); *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975) (holding that in determining whether the causal chain has been sufficiently attenuated courts should consider how much time elapsed between the illegality and the acquisition of the evidence, the presence of intervening circumstances, and the purpose and flagrancy of the official conduct). The exclusionary rule applies to verbal statements obtained as a result of official misconduct as well as to the more traditional seizure of physical evidence. *Yousif,* 308 F.3d at 832 ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

For the reasons stated above, Chaney was seized for Fourth Amendment purposes from the time Trooper Johnson initiated the traffic stop at 9:53 p.m. on June 30, 2015, through the time he gave a video recorded statement to police on July 1, 2015. Trooper Johnson's detention of Chaney beyond the time necessary to complete the traffic stop and issue Clark a citation violated Chaney's Fourth Amendment right because it was neither consensual nor supported by a reasonable, articulable suspicion that criminal activity was afoot. The United States has failed to articulate any intervening events or attenuating circumstances that would purge the primary taint of the illegal extension of the traffic stop. Because Chaney's post-arrest statements as well as the evidence seized from Chaney's Volvo and cell phone were obtained as a result the illegal detention, they are tainted and must be suppressed as fruits of an unlawful search and seizure. *Wong Sun,* 371 U.S. at 485.

The undersigned is cognizant of the social cost of suppressing evidence and potentially letting a factually guilty person go free. However, this cost must be balanced against the cost of allowing police to search a person or his property in violation of the Fourth Amendment. Although there is nothing in the evidentiary record to suggest that Trooper Johnson was intentionally acting in bad faith, there is evidence that both Trooper Johnson and his supervisor believed that Missouri State Highway patrolmen have the authority, and even the duty, to detain motorists based on a generalized suspicion or hunch that "something isn't quite right" or, in the alternative, to detain motorists for the purpose of developing the quantum of evidence needed to justify detention. Such a practice clearly contravenes the Constitution. In light of this evidence, application of the well-established exclusionary rule to settle the constitutional balancing of the social ills presented in this case seems particularly apropos to ensure that, in the end, the Fourth Amendment prevails. *See Maryland v. King,* 133 S. Ct. 1958, 1989 (2013) (Scalia, J., dissenting) ("The Fourth Amendment must prevail").

## CONCLUSION

For all of the foregoing reasons, Chaney's motion to suppress physical evidence (Doc. 92) and statements (Doc. 93) should be granted.

_____

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of June, 2016.